WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leticia Sandoval, | No. CV-13-00448-TUC-CRP |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security | |
| Defendant. | |

Plaintiff Leticia Sandoval has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).  Pending before the Court are Plaintiff's Opening Brief (Doc. 26) ("Plaintiff's Brief") and Defendant's Memorandum in Support of the Commissioner's Decision (Doc. 31).  For the following reasons, the Court remands this matter for further proceedings.

## BACKGROUND

In March 2010, Sandoval protectively filed applications for disability insurance benefits and supplemental social security income under the Social Security Act. (Administrative Record ("AR.") 16, 218-19, 222-26, 355).  Sandoval alleges that she has been unable to work since June 15, 2006[1] due to ADHD, emphysema, arthritis,

---

[1] Sandoval initially claimed that she became unable to work in December 2007,

1    fibromyalgia, and depression.  (AR. 218-19, 222-26, 355).

2           Sandoval was born on March 13, 1966, making her 45 years of age on the date of

3    when the Commissioner issued the final decision on this matter.  (AR. 196; Defendant's

4    Brief, p. 2).  She is divorced and the mother of three children.  (AR. 1036).  Sandoval has

5    a twelfth-grade education and past work experience, from 1997 through 2005, as a

6    cashier.  (AR.  245, 253, 257, 259 (also indicating Sandoval worked in construction, as a

7    hotel maid, and nursing assistant)).    Sandoval stopped working in 2007 after she

8    underwent multiple surgeries:  the first surgery involved a spur on her right heel; another

9    involved her left knee; and the last, her right knee.  (AR. 42; *see also* AR. 18-19).  Pain

10   and swelling limit her ability to walk and cause her to trip and fall.  (AR. 42).

11          After Sandoval's applications were denied initially and on reconsideration, the

12   matter proceeded to hearing before Administrative Law Judge Larry E. Johnson ("ALJ"),

13   where Sandoval, who was represented by counsel, testified.  (AR. 36-55).  On October

14   21, 2011, the ALJ issued his decision finding Sandoval, was not disabled under the Social

15   Security Act.  (AR. 16-26).  Thereafter, the Appeals Council denied Sandoval's request

16   for review, thus rendering the ALJ's October 21, 2011 Decision the final decision of the

17   Commissioner.  (AR. 1-7, 28-30).

18          Sandoval then initiated the instant action, arguing that: (1) the ALJ's finding that

19   she did not have an impairment or combination of impairments that meets or equals the

20   listings is not supported by substantial evidence; and (2) the ALJ's residual functional

21   capacity analysis is not supported by substantial evidence and inconsistent with the law

22   primarily because the ALJ erroneously rejected the treating psychiatrist's opinion,

23   Sandoval's credibility, and lay witness testimony.

24          Defendant counters that the ALJ properly considered the evidence and that his

25   decision was supported by substantial evidence.

26   **STANDARD**

27          The Court has the "power to enter, upon the pleadings and transcript of the record,

28   _____

but she later amended that date to June 15, 2006.  (*See* AR. 218, 222, 355).

a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (*citing Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (*quoting Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

## DISCUSSION

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 C.F.R. §§404.1520, 416.920. To establish disability, the claimant must show she has not worked since the alleged disability onset date, she has a severe impairment, and her impairment meets or equals a listed impairment or her

residual functional capacity ("RFC")[1] precludes her from performing past work. Where the claimant meets her burden, the Commissioner must show that the claimant is able to perform other work, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.

**THE ALJ'S FINDINGS IN PERTINENT PART**

The ALJ found that Sandoval had not engaged in substantial gainful activity since June 15, 2006, the alleged onset date. (AR.18). He also found that Sandoval had the following severe impairments: status post arthroscopic surgery with resection of the left and right knees; right shoulder subacromial bursitis; right heel spur; fibromyalgia; depression; and anxiety. (*Id.*). He determined that Sandoval did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments. (TR. 19). Instead, the ALJ found that Sandoval has the RFC to perform unskilled, medium work. (AR. 21 (citing 20 C.F.R. §§ 404.1567(c), 416.967(c) (defining medium work)). The ALJ, after consulting the *Dictionary of Occupational Titles*, concluded that Sandoval is able to perform her past work as a cashier as that position is generally and actually performed. (AR. 24). The ALJ also alternatively found that other work exists in significant numbers in the national economy that Sandoval is capable of performing. (AR. 25 (citing the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2)). Therefore, the ALJ found that Sandoval has not been under a disability as defined in the Social Security Act from June 15, 2006 through the date of his decision. (*Id.*).

**THE ALJ'S REJECTION OF TREATING DR. FITZPARTICK'S OPINION WAS IMPROPER.**

In challenging the ALJ's determinations at both step three and four, Sandoval takes issue with the ALJ's rejection of the opinion of Sandoval's treating psychiatrist Elizabeth Fitzpatrick, M.D., at COPE Community Services. Therefore, at the outset, the

---

[1]RFC is defined as that which an individual can still do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

Court addresses the ALJ's rejection of Dr. Fitzpatrick's opinion which addresses Sandoval's mental impairments.

The record reflects that in November 2008, when Sandoval was 42 years of age, she sought treatment at COPE Community Services upon referral from Southern Arizona Mental Health Corporation  (AR. 1026, 1035-36).  She reported that she had been raised by her grandparents because her mother died of cancer when she was six years of age and her father was apparently not in her life.  (AR. 1036; *see also id.* (Sandoval did not meet her father until she was 25 years of age, and he died soon after)).  At the age of 17, Sandoval became pregnant and went to live with foster parents.  (AR. 1036).

When Sandoval was seven years of age, she was sexually abused by one of her uncles "for a couple of months" and the abuse was never reported to the authorities.  (*Id*; *see also* AR. 1385 (2009 COPE note indicating Sandoval reported sexual abuse occurring at ages 5 and 11 and that she sustained multiple beatings as a child)).  She also reported that her ex-husband, whom she was married to for about a year when she was 35, was also physically and sexually abusive toward her.  (AR. 1036).  She also sustained physical injuries inflicted by an ex-boyfriend who was abusive toward her over a period of three years.  (*Id.*).  Furthermore, her oldest son was physically abusive toward her. (AR. 1385).

Upon intake at COPE, Sandoval reported that her grandson, while in her care, was taken into CPS custody, and "since that occurred, she has been very depressed and tearful."  (AR. 1035).  The COPE Assessor also noted that due to Sandoval's "extensive history of being abused and molested…she has problems sleeping and eats too much. Client also reported that she has been having a hard time getting over the many deaths in her family.  Client reported that she has been suffering from PTSD due to being abused in the past for several years….Client said that she suffers from her low mood and from flashbacks on a daily basis."  (*Id.*)

Sandoval also reported "that she began using percocet[] about a week ago in order to 'numb' her and to help her go to sleep."  (*Id.*).  She stated that she would purchase the

pills in the street "so that she can self medicate herself." (*Id.*). She took the pills daily, and she took the last pill about 4 or 5 days prior to her appointment at COPE. (*Id.*).

Sandoval was diagnosed with depressive disorder, NOS; anxiety disorder, NOS; opioid type dependence; unspecified use; and PTSD. (AR. 1036).

The record reflects that Sandoval continued treatment at COPE through at least 2011.[2] During treatment at COPE: Sandoval's diagnoses included depressive disorder, NOS, anxiety disorder, NOS, opioid type dependence, unspecified use, and PTSD; her global assessment of functioning score ("GAF") was assessed at 60; and she was prescribed medications including Cymbalta, Temazepam, Risperdal Concerta, Ambien, Wellbutrin, and Zolpidem Tartrate. (*See e.g.* AR. 1005 (ADHD, predominantly inattentive type is added to diagnosis and provider notes depression is related to chronic pain), 1006 (diagnosis also includes learning disorder, NOS), 1235, 1328-29, 1380, 1385-86, 1389, 1395, 1413, 1492 (diagnosis includes major depressive disorder, recurrent mild); 1493 (Dr. Fitzpatrick's November 2010 diagnosis of generalized anxiety disorder; major depressive disorder recurrent mild; PTSD; opioid dependence; ADHD predominantly inattentive type), 1501).

In June 2011, Dr. Fitzpatrick completed a Medical Source Statement of Ability to do Work-Related Activities (mental). (AR. 1761-64) Dr. Fitzpatrick indicated that Sandoval's depression "is so severe that it has impaired her concentration" to the extent that her ability to remember and carry out instructions is impaired as follows: Sandoval is moderately impaired with regard to understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments on simple work-related decisions. (AR. 1761). Additionally, Sandoval is markedly impaired with regard to understanding and remembering complex instructions, carrying

---

[2] In March 2011, Sandoval received notice from Community Partnership of Southern Arizona that she had been "determined eligible for the S[eriously] M[entally] I[ll] ["SMI"] program category…" and her assigned case management agency will continue to be Cope. (AR. 1517). Defendant points out that the records supporting the SMI finding have not been cited and that "a decision by any other governmental agency about whether a Social Security disability claimant is disabled based on its own rules is not binding on the Commissioner…." (Defendant's Brief, p. 19) (citing 20 C.F.R. §§404.1504, 416.1504).

out complex instructions, and making judgments on complex work-related decisions. (*Id.*).  Dr. Fitzpatrick also indicated that Sandoval is moderately impaired with regard to interacting appropriately with supervisors and co-workers.  (AR. 1762).  Sandoval is markedly impaired with regard to responding appropriately to usual work situations and to changes in a routine work setting.  (*Id.*).  Dr. Fitzpatrick also indicated that Sandoval's ability to interact appropriately with the public is moderately to markedly limited.  (*Id.*).  According to Dr. Fitzpatrick, Sandoval "is highly emotional, and easily cries.   She doesn't feel comfortable interacting with others as a result, and becomes isolative when depressed."  (*Id.*).

The ALJ gave "no weight" to Dr. Fitzpatrick's opinion.  (AR. 24).

It is well-settled that the opinions of treating physicians, like Dr. Fitzpatrick, are entitled to greater weight than the opinions of examining or non-examining physicians. *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995). Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating physicians are accorded special weight because treating physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to 'substantial weight.'"); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989) ("We afford greater weight to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")(internal quotation marks and citation omitted); 20 C.F.R §§ 404.1527, 416.927 (generally, more weight is given to treating sources).

An ALJ may reject a treating physician's uncontradicted opinion only after giving "'clear and convincing reasons' supported by substantial evidence in the record." *Reddick*

*v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)).  "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record."  *Id.* at 725 (citing *Lester,* 81 F.3d. at 830).  Here, Defendant asserts that the ALJ met his burden of setting out clear and convincing reasons for rejecting Dr. Fitzpatrick's opinion.  (Defendant's Brief, p. 17).  From Defendant's argument that the ALJ adhered to the clear and convincing standard, the Court presumes Defendant's position is that Dr. Fitzpatrick's opinion was uncontradicted.

The ALJ completely rejected treating Dr. Fitzpatrick's opinion as follows:

> Her opinion is not well-supported by the record.  She opined that the clamant had moderate and marked limitations.  In the record, however, she noted that the claimant's symptoms are situational and that she continues to be under a lot of stress.  Despite the stress, Dr. Fitzpatrick continues to assigned [sic] a GAF of 60, indicating only moderate symptoms.  For that reasons, no weight is given to her opinion.

(AR. 24).

Sandoval contends that GAF scores do not bear a direct correlation to severity requirements and, thus, the ALJ's rejection of Dr. Fitzpatrick's opinion based on the GAF assessment was improper.  (Plaintiff's Brief, p. 14 (citing 65 Fed.Reg. 50,746, 50,764-65 (Aug. 21, 2000)).  "'A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.'" *Garrison v. Colvin,* 759 F.3d 995, 1003 n. 4 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998)).  According to the *DSM–IV*, a GAF score between 51 to 60 describes "moderate symptoms" or any moderate difficulty in social, occupational, or school functioning.  *Id.*  The Ninth Circuit recently observed that "[a]lthough GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work

environments in important respects." *Id.* (citation omitted); *see also Vose v. Astrue,* 2007 WL 4468720, *17 (Dec. 17, 2007) ("[C]ourts have specifically held that a GAF score does not directly correlate to disability.").

In defending the ALJ's rejection of Dr. Fitzpatrick's opinion, Defendant contends that elsewhere in his decision, the ALJ cited favorable mental functional findings that contradicted Dr. Fitzpatrick's opinion and, thus, "[e]ven assuming arguendo that the ALJ erred in referring to [GAF] scores in assessing Dr. Fitzpatrick's opinion,…the ALJ cited other clear and convincing evidence supporting his decision." (Defendant's Brief, p. 17 (footnote omitted)).

The ALJ's rejection of Dr. Fitzpatrick's opinion is clearly and unequivocally based on Dr. Fitzpatrick's statement that Sandoval's symptoms are situational and the ALJ's opinion that a GAF of 60 is inconsistent with Dr. Fitzpatrick's opinion.[3]  The ALJ's reliance on the GAF score to reject Dr. Fitzpatrick's decision is also undercut by the fact that the majority of limitations indicated by Dr. Fitzpatrick in her 2011 assessment were moderate, which are arguably consistent with a GAF score indicating

---

[3] Defendant's relies on *Lewis v. Astrue,* 236 F.3d 503 (9th Cir. 2001), to support her position that that the ALJ provided reasons elsewhere in his decision to reject Dr. Fitzpatrick's opinion. (Defendant's Brief, p. 17 n. 8).  According to Defendant, "while the ALJ's discussion in this regard may be located elsewhere in the decision than where []he discussed Dr. Fitzpatrick's opinion, it applies equally to the ALJ's finding in this regard.  *See Lewis,* 236 F.3d at 513."  (*Id.*).  *Lewis* is inapposite.  *Lewis* involved an ALJ's statement of reasons for the determination that the plaintiff did not meet or equal a listing at step three.  *Lewis,* 236 F.3d at 513.  The *Lewis* court was clear that the plaintiff did not claim that the ALJ erred in rejecting the opinion of the treating psychologist. *Lewis,* 236 F.3d at 513 n.9.  *Lewis* neither discussed nor involved the standard for rejecting a treating physician's opinion or whether an ALJ's statements completely unconnected to his reasons for rejecting the treating physician's opinion can be used to meet the test.  Nor has Defendant cited any authority for such a premise.  As stated *supra,* the ALJ was clear as to his reason for rejecting Dr. Fitzpatrick's opinion.  If he had other reasons, he could have specifically cited them as reasons supporting his rejection of Dr. Fitzpatrick's opinion, but he did not do this.  *Cf. Pinto v. Massanari,* 249 F.3d 840, 847-48 (9th Cir. 2001) ("we cannot affirm the decisions of an agency on a ground that the agency did not invoke in making its decision.").  Furthermore, to the extent that Defendant also argues that Dr. Fitzpatrick's opinion is undermined by the ALJ's credibility finding, (*see* Defendant's Brief, p. 18), the ALJ never cited such a reason for rejecting Dr. Fitzpatrick's opinion. *See e.g. Pinto,* 249 F.3d at 847-48.

moderate symptoms and/or moderate difficulty in functioning.[4]

Defendant further asserts that "[t]he ALJ, in fact, emphasized the situational nature of Plaintiff's psychiatric symptoms, which included stress, and which…did not suggest prolonged loss of function." (Defendant's Brief, p. 17). However, Defendant's characterization that Sandoval does not exhibit prolonged loss of function is not borne out by the record. "The critical issue in a disability case is the claimant's 'capacity for work activity on a *regular and continuing basis.*'" *Irwin v. Shalala,* 840 F.Supp. 751, 763 (D. Or. 1993) *(quoting* 20 C.F.R. § 404.1545(b)) (emphasis in original). Thus, for example, "[w]here it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity." *Gatliff v. Commissioner of Social Security Admin.,* 172 F.3d 690, 694 (9th Cir. 1999) (no substantial gainful employment where plaintiff is unable to hold a job for more than 2 months at a time). "Occasional symptom-free periods–and even the sporadic ability to work–are not inconsistent with disability." *Lester,* 81 F.3d at 833.

Sandoval further persuasively points out that

> [s]ince mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace

---

[4] Consistent with Dr. Fitzpatrick's assessment, examining psychologist Stephen Bailey, Ed.D., and examining psychiatrist Hunter Yost, M.D., assessed Sandoval's GAF at 55 (AR. 1264 (Dr. Bailey in June 2010)) and 51-60 (AR. 852 (Dr. Yost in March 2009)). Moreover, although the parties do not discuss them, Drs. Bailey's and Yost's opinions are largely in line with Dr. Fitzpatrick's opinion. (*See e.g.,* AR. 1264, (Dr. Baily , diagnosed major depressive disorder, recurrent, moderate, and personality disorder, and assessed mild to moderate limitations regarding Sandoval's abilities in persistence and pace, completing a 40-hour work week, adaptation and social interactions); AR.852-53 (although Dr. Yost, who diagnosed major depressive disorder with moderate features, found no significant limitations with understanding and memory, he indicated that Sandoval's social interaction was "[m]inimal, limited to neighbors and immediate family. Otherwise, she does not initiate or have other social contacts[]"; and with regard to adaptation, "[s]he has no desire to leave her house.")). The ALJ accorded "little weight" to Drs. Bailey's and Yost's opinions. (AR. 24).

> if often extremely difficult….The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day….Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job.

SSR 85-15, 1985 WL 56857 at *5-*6.

To support the position that Sandoval's situational stressors are not of a prolonged duration, Defendant cites four records, dated late 2010 through 2011, where treating Dr. Fitzpatrick noted situational stressors. (Defendant's Brief, p. 17 (citing AR. 1501, 1505, 1718, 1729)). However, the record is replete with other COPE records documenting Sandoval's long history of difficulty dealing with stress. For example, Sandoval first sought treatment at COPE in 2008 due to depression when CPS took away her grandson who was in her care. (AR. 1030, 1035-36; *see* also AR. 1367 (in November 2008, Sandoval also reported "flashbacks of her sexual and physical trauma from the past.")). In addition to depression and tearfulness, Sandoval reported flashbacks on a daily basis. (AR. 1367 (Sandoval presented as depressed, "very tearful…even sobbing at time[s]…")). In January 2009, Sandoval presented to COPE "upset and crying as has just gotten a call that her favorite aunt is in the hospital in a deep coma and dying…." (AR. 1380). At that same visit, Sandoval reported sadness and grief about other family members who had passed away, fighting with her daughter about her grandson's placement in foster care after CPS involvement, and that she gets about four to five hours of broken sleep. (*Id.*). Sandoval "[a]dmits thinks [sic] had been depressed her whole life, 'my life has been hell.'" (*Id.*). In late 2009 early 2010, Sandoval missed appointments because of health issues culminating in a hysterectomy in early 2010. (*See e.g.* AR. 1417, 1419-22, 1428). COPE notes during this time reflect that: "[a]nxiety continues to be a problem, so Cymbalta increased." (AR. 1430). By late June  of 2010, Sandoval

presented as "visibly upset" and reported having been evicted from her apartment after her son, who was visiting, got into a fight with another resident in the complex.  (AR. 1441).  Although during the next few weeks, Sandoval reported that, after initial anxiety about being evicted, she was doing better because she was staying with her aunt (AR. 1442-43), by July 7, 2010, she reported "I am not good" and was upset because she lost her home and is having to live with her aunt, sleeping on the sofa in the living room. (AR. 1445 (noting Sandoval was tearful and depressed and did "not have a good support system"; AR. 1446)).  Additionally, "her cousin was shot the other day" and her daughter, who abuses drugs, "was purposefully trying to make things difficult for…" her by threatening to take Sandoval's medications.  (AR. 1446 (Sandoval "appeared depressed and was tearful through part of the visit.")).  In early August 2010, Dr. Fitzpatrick notes that Sandoval "continues to be quite anxious, stressed out[]" and "overwhelmed…." (AR. 1453).  By August 19, 2010, Sandoval presented in "constant movement…rubbing top of nursing desk and touching items…, squirming in her seat…biting her inner lips." (AR. 1459).   She reported she had been thinking about suicide, but was without plan or intent.  (*Id.*).  When Sandoval did obtain housing again, she presented as "very restless and ha[d] difficulty sitting and keeping her hands still…" and she reported she was anxious about losing her home again.  (AR. 1460).

Against this backdrop, the Court turns to the records cited by Defendant.  First, after learning in December 2010 that Sandoval's daughter had left one of Sandoval's grandsons with her, Dr. Fitzpatrick noted that Sandoval "has a lot of situational stress right now."  (AR. 1501).  By January 2011, when Sandoval's daughter had taken back custody of the boy, Sandoval was "very upset" and presented as "tearful, dysphoric…." (AR. 1505).  Dr. Fitzpatrick wrote that Sandoval "is under a lot of stress."  (*Id.*).  In April, 2011, Dr. Fitzpatrick found that Sandoval "is endorsing more anxiety related to situational stressors."  (AR. 1718).  By June 2011, when Sandoval presented as "very tearful" with complaints related to her physical impairments, Dr. Fitzpatrick stated: "[Sandoval] is extremely overwhelmed—facing severe financial stress, medical

- 12 -

problems, limited social support." (AR. 1729).

At bottom, as opposed to isolated or sporadic events, the record suggests a continuum of "situational" stressors in Sandoval's life resulting in the moderate and marked limitations assessed by Dr. Fitzpatrick.  Upon consideration of the evidence of record, the ALJ's rejection of Dr. Fitzpatrick's assessed limitations caused by Sandoval's mental impairments as merely "situational" is not supported by the substantial evidence of record.  Nor has the ALJ stated clear and convincing reasons for rejecting Dr. Fitzpatrick's opinion.  Moreover, to any extent that Defendant may belatedly take the position that the ALJ was only required to set out specific and legitimate reasons to reject Dr. Fitzpatrick's opinion, rather than clear and convincing, the Court concludes that the ALJ has failed to meet that burden as well for the same reasons as stated above.

**THE ALJ'S STEP 3 DETERMINATION.**

Sandoval contends that the ALJ never mentioned her physical impairments when making the step three determination.  (Plaintiff's Brief, p. 9).  She also asserts that the ALJ only cursorily engaged in the analysis required for evaluation of mental impairments and that he failed to cite substantial evidence in support of his determination.  (*Id.* at pp.9-10).  Finally, she argues that when treating psychiatrist Dr. Fitzpatrick's opinion is properly considered, the record will reflect that her "mental impairments (singly or in combination, with or without multiple, severe physical impairments) meet the Listings for her Major Depressive Disorder and/or PTSD." (*Id.* at pp. 11-12).

The listings describe specific impairments of each of the major body systems which are considered "severe enough to prevent a person from doing any gainful activity, regardless of his or her age, education, or work experience" and designate "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R.  §§ 404.1525(a), (c)(3), 416.925(a), (c)(3). A mere diagnosis is insufficient to meet or equal a listed impairment; instead, a claimant must establish that he or she satisfies all of the criteria of that listing, including any relevant criteria in the introduction. *See id*. §§ 404.1525(c)(3), (d), 416.925(c)(3), (d).

To equal a listed impairment, a claimant must establish symptoms, signs, and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment. *See generally* 20 C.F.R. §§ 404.1526 (explaining medical equivalence); 416.926 (same). Medical equivalence can be found for a listed impairment, an unlisted impairment, or a combination of impairments. *See id*. §§ 404.1526(b), 416.926(b). If a claimant has an impairment described in the listings, but either does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more findings is not as severe as specified in the listing, then a finding that the impairment is medically equivalent to the listing would be appropriate when other findings related to the impairment are found that are at least of equal medical significance to the required criteria. *Id*. A generalized assertion of functional problems is not enough to establish disability at step three. *Tackett,* 180 F.3d at 1100 (citing 20 C.F.R. § 404.1526.)

Sandoval has the burden of proof at step three.  *Parra,* 481 F.3d at 746; *see also Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir.2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence.") (citation omitted); *Lewis,* 236 F.3d at 514 (affirming unfavorable step 3 determination even though the ALJ did not discuss the claimant's impairments or compare them to any listing, where the claimant offered "no theory, plausible or otherwise" and pointed to no evidence supporting a finding that he met or equaled a listed impairment).  Sandoval, who was represented by counsel during the administrative proceeding, presented no argument to the ALJ or Appeals Council that the evidence demonstrated that her impairments, either singly or in combination, met the requisite severity to establish disability under the listings or to equal a listing.  (*See e.g.* AR. 36-55, 427-28).

The ALJ is obligated to consider the relevant evidence to determine whether a claimant's impairment or combination thereof meet or equal one of the specified

impairments set forth in the listings. *Lewis,* 236 F.3d at 512; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Generally, a "boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not [meet or equal a listing]." *Lewis,* 236 F.3d at 512; s*ee also, e.g., Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir. 1990) (noting that the ALJ's unexplained finding at step three was reversible error). The Ninth Circuit has recognized, however, that the ALJ need not state the reasons for his step three determination under the heading "Findings," so long as the evidence is discussed in the ALJ's decision. *Lewis*, 236 F.3d at 513.  Moreover, a boilerplate finding may be appropriate where, as here, the claimant fails to set forth any evidence for the ALJ to conclude an impairment could meet or equal a listing. *See Gonzalez v. Sullivan,* 914 F.2d 1197, 1201 (9th Cir. 1990).  Finally, the ALJ need not to state why a claimant failed to satisfy every different section of the listing of impairments.  *Id.*

As to Sandoval's complaint that the ALJ never discussed her physical impairments at step three, Defendant counters that the ALJ discussed those impairments in detail elsewhere in his decision.  (Defendant's Brief, pp. 8-9; *see also* AR. 17-18, 21-22).  The Court agrees with Defendant that the ALJ's evaluation and discussion of a claimant's physical impairments elsewhere in the decision can support a step three finding.  *See Lewis,* 236 F.3d at 513.  Here, there can be no dispute that the ALJ stated the reasons for his determination why Sandoval did not establish that she met or equaled the criteria necessary for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) (*see* AR. 19-20).  Consequently, Sandoval's argument fails.

Nor does the ALJ's erroneous rejection of treating Dr. Fitzpatrick's opinion alter the ALJ's step three determination in this case.  Sandoval, who bears the burden at step three, failed to explain below any theory upon which her impairments, singly or in combination, meets or equals a listing, and she also fails to articulate or establish such a theory before this Court.  Further, Dr. Fitzpatrick's opinion does not specifically address or correlate to Listings 12.04 or 12.06.  Thus, even if this Court were to credit Dr. Fitzpatrick's opinion as true at step three, Sandoval has presented no basis upon which to

conclude that her "mental impairments (singly or in combination with or without multiple, severe physical impairments) meet the Listings for her Major Depressive Disorder and/or PTSD." (Plaintiff's Brief, pp. 11-12).[5] Nor, based on the arguments before this Court, does the substantial evidence of record suggest otherwise.

Sandoval has failed to establish that the ALJ's step three determination was erroneous.

**THE ALJ'S STEP 4 DETERMINATION**

Sandoval challenges the ALJ's RFC determination at step four based upon his improper rejection of Dr. Fitzpatrick's opinion. Sandoval also argues that the ALJ improperly discounted her credibility and lay witness testimony.

**DR. FITZPATRICK'S OPINION.** The ALJ's determined that Sandoval could perform the full range of unskilled, medium work. He assessed no specific mental limitations. To the extent that the ALJ included "unskilled" work in the RFC, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." SSR 85-15, 1985 WL

---

[5] Giving Sandoval the benefit of the doubt, the Court notes that the criteria for the listings for mental impairments include paragraph A and B criteria which must be satisfied. *See e.g.,* 20 C.F.R. pt. 404, subpt. P, app 1, §12.00 *et seq.* In the absence of paragraph A and B criteria, paragraph C criteria must be present. *Id.* Sandoval appears to specifically challenge the ALJ's finding with regard to paragraph B criteria which requires that the mental impairment(s) must result in at least two of the following: marked restriction of daily activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration...." *Id.* (*See also* Plaintiff's Brief, p.11). While Dr. Fitzpatrick opined that Sandoval was markedly limited in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions, Dr. Fitzpatrick was clear that Sandoval was moderately, not markedly, limited with regard to the same abilities when simple instructions and work-related decisions were at issue. (AR. 1761). While Dr. Fitzpatrick assessed moderate to marked limitations regarding Sandoval's social interactions, she did not discuss limitations with regard to Sandoval's daily activities. (*Id.*). Sandoval offers no explanation as to how Dr. Fitzpatrick's assessment results in a finding that Sandoval has satisfied the Paragraph B criteria.

56857 at *4.   Further, as discussed above, "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual [with mental impairments] will have in meeting the demands of the job.  A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job….*Any impairment-related limitations created by an individual's response to demands of work...must be reflected in the RFC assessment.*" *Id.* at *4-*6 (emphasis added).    Here, Dr. Fitzpatrick indicated Sandoval's mental impairments resulted in, *inter alia,* moderate to marked limitations in interacting appropriately with the public and moderate limitations in interacting appropriately with co-workers and supervisors.  (AR. 1762).  She also indicated that Sandoval was markedly limited in responding appropriately to usual work situations and to changes a routine work setting.  (*Id.*).  These limitations clearly impact the RFC determination.  *See e.g.* SSR 85-15, 1985 WL 56857.   Consequently, the ALJ's erroneous rejection of Dr. Fitzpatrick's opinion regarding Sandoval's mental impairments directly impacts the RFC determination and renders the RFC finding unsupported by substantial evidence of record.  Although the Court has primarily focused on Sandoval's restrictions regarding Sandoval's ability to interact appropriately with others, the RFC should be assessed upon consideration of the whole of Dr. Fitzpatrick's opinion.

**CREDIBILITY.**    Sandoval takes issue with the ALJ's finding that although her impairments could reasonably be expected to cause the symptoms she complained of, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  (*See* AR. 21, 24).

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to some degree of the symptom(s), and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's

symptom testimony must be clear and convincing.  *Garrison,* 759 F.3d at 1014; *see also Burrell v. Colvin,* 775 F.3d 1133, 1136-37 (9th Cir. 2014) (reaffirming clear and convincing standard applies to credibility assessment)).  "The 'clear and convincing' standard is the most demanding required in Social Security cases."  *Id.* (quoting *Moore v. Commissioner of Soc. Sec Admin.,* 278 F.3d 920, 924 (9th Cir. 2002).

To satisfy the "clear and convincing" standard, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn*, 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive).  In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Id.; Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007); *Robbins v. Social Security Admin.*, 466 F.3d 880, 884 (9th Cir. 2006).

The ALJ's reasons for discounting Sandoval's credibility included that her alleged physical limitations and restrictions were not supported by objective medical evidence, she repeatedly failed to attend physical therapy appointments, she did not seek treatment for her fibromyalgia, and she was reported as exaggerating her pain and exhibiting narcotic seeking behavior.  (AR. 21-22).  With regard to mental limitations, she failed to follow up on recommendations to participate in group or individual therapy and she has not been admitted or incarcerated; "[h]er depression and anxiety are largely related to her situational stress…"; she is able to care for her grandson; she attends church and socializes with neighbors; she is able to use public transportation; and, based on her statements, she is able to perform a variety of activities.  (AR. 21-24).

Sandoval specifically takes issue with the ALJ's reference to lack of objective medical evidence in light of the ALJ's finding that she suffered from fibromyalgia. (Plaintiff's Brief, pp. 23-25; *see also* AR. 18 (ALJ listing Sandoval's fibromyalgia as a severe impairment)).  She points out that there are no "lab tests" for fibromyalgia.  (*Id.* at p. 24).  *See also Benecke v.  Barnhart,* 379 F.3d 587, 589 (9th Cir. 2004) (Although "[t]he American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990,...there are no laboratory tests to confirm the diagnosis.") (citations omitted); SSR 12-2p, 2012 WL 3104869.

If a statement by the ALJ finding the claimant not entirely credible "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible,…" then the ALJ's credibility determination is unsupported and cannot stand.  *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012).  If, however, "'the ALJ has made specific findings justifying a decision to disbelieve an allegation, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.'" *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d  595, 600 (9th Cir. 1999) (quoting *Fair v. Bowen,*  885 F.2d 597, 603 (9th Cir. 1989)).  The ALJ discussed Sandoval's credibility in that section of his decision assessing Sandoval's RFC.  (AR. 21-24).  At the outset of that discussion, the ALJ stated:  "The claimant's alleged limitations and restrictions are not supported by the objective medical evidence."  (AR.  21).  However, the ALJ did not stop there; instead, he went on to discuss Sandoval's various impairments in further detail.  (*See* AR. 21-24).  When discussing Sandoval's fibromyalgia, the ALJ stated:

> In terms of the fibromyalgia, the claimant has not sought treatment for her complaints and there is evidence that her symptoms are not as severe as alleged.  She was evaluated only in January 2010 at which time she was prescribed Lyrica….In March 2010, she indicated that Lyrica was not helping, yet she was reported as exaggerating her pain and exhibiting narcotic seeking behavior.

(AR. 22).  Contrary to Sandoval's assertion, the ALJ did not discount Sandoval's credibility merely because of lack of objective medical evidence with regard to

1    fibromyalgia.

2         Sandoval also specifically challenges the ALJ's finding that her allegations of

3    limitations caused by her mental impairments are not believable because "she has not

4    followed up with recommendations to participate in group or individual therapy, and she

5    has not been admitted or incarcerated."  (AR. 22 (citing AR. 1018 (COPE note stating:

6    "Client was referred to groups and attended the Grief Group one time.  Client also was

7    referred to individual therapy, but did not follow up.") (footnote omitted)).  Sandoval

8    persuasively cites Ninth Circuit authority "[c]riticiz[ing] the use of a lack of treatment to

9    reject mental complaints both because mental illness is notoriously underreported and

10   because 'it is a questionable practice to chastise one with a mental impairment for the

11   exercise of poor judgment in seeking rehabilitation.'" *Regennitter v. Commissioner of*

12   *Social Sec. Admin.,* 166 F.3d 1294, 1300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100

13   F.3d 1462, 1465 (9th Cir. 1996))).  (*See also* Plaintiff's Brief, p. 24).

14        There can be no doubt that beginning in 2008, Sandoval consistently sought

15   mental health treatment at COPE.  Thus, the issue is not that Sandoval wholly failed to

16   seek treatment, but that she did she did not follow through with attending group and

17   individual therapy.  At the hearing, no inquiry was made by the ALJ as to why Sandoval

18   did not attend therapy.  The ALJ also rejected treating psychiatrist Fitzpatrick's opinion,

19   which included that Sandoval was "highly emotional, and easily cries.  She doesn't feel

20   comfortable interacting with others as a result, and becomes isolative when depressed."

21   (AR. 1762).  As discussed *supra*, the ALJ's rejection of Dr. Fitzpatrick's opinion was

22   improper.  Given that Sandoval's mental impairments result in isolative behavior (*see e.g.*

23   AR. 1762 (Dr. Fitzpatrick); AR. 853 (examining Dr. Yost noting Sandoval's minimal

24   social interaction)), the substantial evidence of record at this point in the proceeding does

25   not support a finding that Sandoval is not credible because she did not attend group

26   therapy.  Further, to the extent that the ALJ discounted Sandoval's credibility with regard

27   to her mental impairments, because "her symptoms appear to be largely situational and

28   stress-related…" (AR. 22), as discussed *supra,* the ALJ overlooks evidence in the record

suggesting that Sandoval's mental impairments are not merely sporadically symptomatic, but affect her on a prolonged basis. While there is nothing in the record explaining Sandoval's failure to attend individual therapy other than the fact that she suffers from mental impairments, the ALJ's credibility finding regarding the impact of Sandoval's mental impairments is undermined by his improper rejection of Dr. Fitzpatrick's opinion and failure to consider evidence in the record as a whole supporting the conclusion that Sandoval's symptoms occur on a regular and continuing basis. At this point, the ALJ has failed to state clear and convincing evidence to support his decision to discount Sandoval's credibility related to her mental impairments.

**LAY WITNESS TESTIMONY.** Sandoval submitted statements from her cousin and aunt regarding the impact of her physical and mental limitations. The ALJ found that these statements were only "partially credible" for the reason that:

> The reports cannot necessarily be considered a disinterested third party witness statement. Because of their relationship with the claimant, their testimony would tend to show a bias in her favor and, therefore, they would tend to show agreement in supporting the claimant's alleged symptoms and limitations, despite contrary evidence.

(AR. 24).

Lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account unless he expressly determined to disregard such testimony, in which case he must give reasons that are germane to each witness. *Nguyen*, 100 F.3d at 1467 (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). In finding error when an ALJ rejected lay testimony from family witnesses because they were "'understandably advocates, and biased'", the Ninth Circuit stated that "the same could be said of any family member who testified in any case. The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value, *see Dodrill*, 12 F.3d at 919, ('[a]n eyewitness can often tell whether someone is suffering or merely malingering...this is particularly true of witnesses who view the claimant on a daily

basis...'); such lay witnesses will often be family members." *Smolen*, 80 F.3d at 1289. *See also Regennitter,* 166 F.3d 1at 1298 (same).   Sandoval is correct that the ALJ improperly rejected the lay statements.

Defendant asserts that even if the ALJ erred in rejecting the lay statements, any such error is harmless. (Defendant's Brief, p. 25 (citing *Molina v. Astrue,* 674 F.3d 1104, 1122 (9th Cir. 2012)).   An ALJ's error in rejecting lay testimony is considered harmless when such error is found to be "'inconsequential to the ultimate nondisability determination' in the context of the record as a whole." *Molina,* 674 F.3d at 1122.   In *Molina*, the Ninth Circuit found harmless the ALJ's failure to provide specific reasons for discounting lay testimony where "[t]hat testimony…did not describe any limitations beyond those [the claimant] herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons." *Id.* (footnote and citations omitted)).   "Where harmfulness of the error is not apparent from the circumstances, the party seeking reversal must explain how the error caused harm." *McLeod v. Astrue,* 640 F.3d 881, 887 (9th Cir.2011) (as amended).  Sandoval does not cite specific reasons showing harmful error caused by the ALJ's failure to properly consider the lay testimony.   The lay testimony addresses Sandoval's physical and mental impairments most of which is largely consistent with Sandoval's own description of the limiting effects of her impairments.  In light of the Court's conclusion, *supra,* that the ALJ failed to provide sufficient reasons to discount Sandoval's credibility regarding limitations caused by her mental impairments, the Court concludes that the ALJ's improper rejection of the lay testimony regarding Sandoval's mental impairments is not harmless.

**REMAND FOR FURTHER PROCEEDINGS**

Sandoval requests that the Court credit Dr. Fitzpatrick's opinion, Sandoval's testimony and the lay testimony as true and remand this matter for an immediate award of benefits.  (Plaintiff's Brief, pp. 26-27).   Alternatively, Sandoval requests that the matter be remanded for further proceedings.  (*Id.*).

Remand for an award of benefits is appropriate where:

(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted); *see also Benecke,* 379 F.3d at 593(citations omitted). The *Garrison* court also noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 at 1020 n. 26 (citing *Smolen, ,* 80 F.3d at 1292); *see also Treichler v. Commissioner of Social Security Admin.,* 775 F.3d 1090, 1103 (9th Cir. 2014) (in evaluating whether further administrative proceedings would be useful, "we consider whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules."). Where the test is met, the Ninth Circuit "take[s] the relevant testimony to be established as true and remand[s] for an award of benefits[,]" *Benecke,* 379 F.3d at 593 (citations omitted), unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison,* 759 F.3d at 1021 (citations omitted).

Here, remand for an immediate award of benefits is inappropriate. Even if Dr. Fitzpatrick's opinion is credited as true, Sandoval has not shown that the opinion supports a disability finding on the instant record. As to Sandoval's statements regarding the limiting effects of her mental impairments, "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the claimant's testimony as true." *Treichler,* 775 F.3d at 1106. Thus, "only where 'there are no outstanding issues that must be resolved before a determination of disability can be made,' do we have discretion to

credit a claimant's testimony as true and remand for benefits, and only then where 'it is clear from the record that the ALJ would be required to find [the claimant] disabled' were such evidence credited." *Id.* (quoting *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir 2004)). Here, Defendant has pointed to inconsistencies in Sandoval's own testimony about the limiting effects of her mental impairments, which in turn conflict at times with the lay testimony. (*See* Defendant's Brief, pp. 14, 16-17); *see also Treichler,* 775 F.3d 1090 (remanding for further proceedings where the record reflected inconsistences related to the claimant's credibility and it was not clear on the record that the claimant was disabled). Additionally, the record contains no vocational expert testimony. On the instant record, the Court cannot say that it is clear that the ALJ would be required to award benefits if the improperly discounted evidence were credited as true. Although the Court is not unsympathetic to the fact that remand for further proceedings prolongs an ultimate resolution, the instant record supports no other outcome. As, the Ninth Circuit has recently, stated: "While we have recognized the impact that delays in the award of benefits may have on claimants, such costs are a byproduct of the agency process, and do not 'obscure the more general rule that the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings.'" *Treichler,* 775 F.3d at 1103 (quoting *Harman v. Apfel,* 211 F.3d 1172, 1179 (9th Cir. 2000)).

## CONCLUSION

For the foregoing reasons, this matter is remanded for further proceedings to reassess treating psychiatrist Dr. Fitzpatrick's opinion, and testimony from Sandoval and the lay witnesses concerning the limitations caused by Sandoval's mental impairments.[6]

---

[6] The Court noted many instances in the record where Sandoval or other sources reported she had attended special education classes when she was in school and/or was a slow learner and that she either had difficulty reading and writing and/or could not read. (*See e.g.,* AR. 287, 339, 857, 1263, 1413, 1655). Yet, other statements in the record indicate that Sandoval did not attend special education classes and/or can read and write more than her name. (*See e.g.* AR. 253, 274, 356). While Sandoval's counsel at the administrative level mentioned that Sandoval "only has marginal reading and writing skills in either English or Spanish…" (AR. 427 (memorandum in support of request for review of ALJ's decision)), this was not discussed in the administrative decisions, and

1   Such reconsideration may require testimony from a vocational expert.

2        Accordingly,

3        IT IS ORDERED that this action is REMANDED to the Commissioner for further

4   proceedings consistent with this Order.

5        The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its

6   file in this matter.

7        Dated this 30th day of March 2015.

8

9

10   _____

11   **CHARLES R. PYLE**
     **UNITED STATES MAGISTRATE JUDGE**

12

13

14

15

16

17

18

19

20

21

22

23   _____

24   Sandoval is represented by different counsel in this action who did not raise the issue
     here.  The Court is mindful that '[j]udicial review is appropriate 'only [on] issues which

25   are argued specifically and distinctly in a party's opening brief.'" *Hardt v. Astrue,*  2008
     WL 349003, *7 (D. Ariz. Feb. 6, 2008)  (quoting *Independent Towers of Washington,*

26   *Inc. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)).  The Court's decision to remand

27   this matter for further proceedings is not based upon in any part, and in no way
     considered, the question of Sandoval's literacy.

28